## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

DEREK O. CID,

        Plaintiff,

v.

BOARD OF COUNTY
COMMISSIONERS OF RILEY
COUNTY, KANSAS, et al.,

        Defendants.

Case No. 18-4012-DDC-KGS

## MEMORANDUM AND ORDER

In January 2012, plaintiff Derek O. Cid joined the Riley County Police Department ("RCPD") as a police officer. Plaintiff alleges that, during his employment with the RCPD, he complained about the RCPD's alleged use of a mandatory quota system. Also, plaintiff alleges, defendants retaliated against him after he lodged his complaints about the quota system. Plaintiff resigned from his position on July 28, 2016, because—he contends—he could not comply with the quota system and because defendants retaliated against him after he had complained.

Plaintiff brings this lawsuit under 42 U.S.C. § 1983 and Kansas state law. He asserts three claims. First, plaintiff asserts a claim under 42 U.S.C. § 1983 against (1) the Board of County Commissioners of Riley County, Kansas ("BOCC"), (2) the RCPD, (3) the Riley County Law Board ("RCLB"), (4) RCPD Sergeant Brian W. London in his individual capacity, (5) RCPD Lieutenant Steve C. Boyda in his individual capacity, (6) RCPD Captain Josh D. Kyle in his individual capacity, and (7) Bradley D. Schoen (Director of the RCPD) in his official and individual capacities. Plaintiff alleges that defendants violated his First and Fourteenth Amendment rights by retaliating against him and constructively discharging him from his

employment after he engaged in protected speech by complaining about the RCPD's mandatory quota system (Count I).  Second, plaintiff asserts a retaliatory discharge claim under Kansas law against defendants BOCC, RCPD, RCLB, and Director Schoen in his official capacity.  Plaintiff alleges that these four defendants violated Kansas public policy when they retaliated against him and constructively discharged his employment after he refused to violate the law by making arrests without probable cause (Count II).  Third, plaintiff asserts a claim under 42 U.S.C. § 1983 against defendants BOCC, RCPD, RCLB, and Director Schoen in his official capacity for maintaining a policy or practice that requires officers to arrest individuals without probable cause (Count III).

This matter comes before the court on defendants' Motion to Dismiss under Federal Rules of Civil Procedure 12(b)(2), 12(b)(5), and 12(b)(6).  Doc. 16.  For reasons explained below, the court concludes that plaintiff fails to state a claim for relief under 42 U.S.C. § 1983 (Counts I & III).  The court thus dismisses plaintiff's federal claims under Fed. R. Civ. P. 12(b)(6).  Also, the court declines to exercise supplemental jurisdiction over plaintiff's state law claim.  So, the court dismisses plaintiff's Kansas retaliatory discharge claim (Count II) without prejudice.

## I.     Factual Background

The following facts are taken from plaintiff's Amended Complaint (Doc. 5-1) and viewed in the light most favorable to him.  *S.E.C. v. Shields*, 744 F.3d 633, 640 (10th Cir. 2014) ("We accept as true all well-pleaded factual allegations in the complaint and view them in the light most favorable to the [plaintiff]." (citation and internal quotation marks omitted)).

In January 2012, the RCPD hired plaintiff as a police officer.  The RCPD assigned plaintiff to work Watch 3—a shift that ran from 2:00 p.m. to 10:00 p.m.  Sergeant Ryan Flerlage

was one of plaintiff's supervisors on Watch 3.  While plaintiff worked on Watch 3, Sergeant Flerlage and plaintiff's other supervisors gave plaintiff positive performance reviews.  Also, they recommended that the RCPD consider plaintiff for the next open detective position.

In September 2015, the RCPD moved plaintiff from Watch 3 to Watch 1—the midnight shift.  Sergeant Brian London and Sergeant Daniel Bortnick became plaintiff's new supervisors on Watch 1.

On October 6, 2015, Sergeant Bortnick sent an email to all officers on Watch 1— including plaintiff—that provided each officer's arrest statistics.  Sergeant Bortnick's email recognized that self-initiated stops and activity had increased, but he also warned officers that they had missed their DUI "goal" of 105 for two quarters in a row.  Doc. 5-1 at 6 (Am. Compl. ¶ 32).  Sergeant Bortnick told officers that they needed to "buckle down" to meet the annual DUI arrest goal.  *Id.*

A few weeks later, plaintiff met with Sergeant London and Sergeant Bortnick.  In this meeting, the Sergeants explained plaintiff's DUI "goal" to him.  Also, they told plaintiff that he was subject to a mandatory "Quota/Non-Quota" system.  This system required plaintiff to make at least two DUI arrests and to issue 15 parking tickets each month.  *Id.* (Am. Compl. ¶ 33).  If plaintiff failed to meet his quotas each month, the Sergeants told him, plaintiff would receive an unsatisfactory performance rating.

In early November 2015, plaintiff met with Sergeant Bortnick to express "his concern . . . that mandatory compliance with the quota system would likely force officers to make unsupported stops resulting in departmental violations and Fourth Amendment issues."  *Id.* (Am. Compl. ¶ 35).  Sergeant Bortnick ignored plaintiff's concerns and told him to "'just concentrate on meeting the numbers.'"  *Id.* at 7 (Am. Compl. ¶ 36).

On November 9, 2015, plaintiff received his quarterly evaluation for August through October 2015. Sergeant London gave plaintiff a "below expectations" rating for Police Vehicle Operations. Plaintiff asserts that Sergeant London's evaluation of him violated RCPD policy.

After receiving his performance evaluation, Sergeants Bortnick and London continued to "harass" plaintiff about his arrest numbers and meeting his "quotas." *Id.* at 8 (Am. Compl. ¶ 43). Plaintiff responded, explaining "that he was engaging in proactive policing but that he could not blindly adhere to mandatory quotas, that he believed it made officers abandon their discretion and required them to engage in unjustified stops, false arrests, and unsupported summonses, and hurt the department's relationship with the community." *Id.* (Am. Compl. ¶ 44). In response, plaintiff's supervisors told him to concentrate on his statistics.

In February 2016, plaintiff received another quarterly evaluation for the months of November 2015 through January 2016. In this evaluation, Sergeant London rated plaintiff "below expectations" in Leadership. Also, Sergeant London told plaintiff that he needed "'to make good on [his] DUI goal.'" *Id.* (Am. Compl. ¶ 48). When plaintiff met with Sergeant London to discuss his evaluation, Sergeant London explained that he rated plaintiff "below expectations" in Leadership mainly because plaintiff had not met his DUI quota. Plaintiff protested that his statistics were similar to other officers on his shift. Plaintiff contended that his statistics showed he was making appropriate traffic stops and being proactive even if he wasn't meeting his DUI quota. Despite plaintiff's protests, Sergeant London maintained plaintiff's "below expectations" rating.

For the next seven months, Sergeants London and Bortnick berated plaintiff constantly. They falsely and publicly suggested that plaintiff was lazy, avoided taking reports, didn't know how to complete reports or complete a proper investigation, and didn't know RCPD policies.

Also, they mischaracterized certain events to justify discipline against plaintiff. And they criticized plaintiff for things that they never criticized other officers for doing.

In May 2016, plaintiff received his annual evaluation for 2015–2016. In this evaluation, Sergeant London rated plaintiff as "below expectations" in Leadership and Police Vehicle Operations. Also, he gave plaintiff an overall annual rating of "below expectations." Because of this rating, plaintiff did not receive an annual merit raise. Sergeant London told plaintiff that he received a "below expectations" rating on his review because he had not met his DUI quotas and because he violated a policy that Sergeant Flerlage already had addressed the previous August. In his review of his evaluation, plaintiff found many errors. They included that his statistics—as reported in his evaluation—were wrong and artificially low. Also, plaintiff provided Sergeant London with "several examples of complex cases and other time-consuming activities and services he had provided to the department and community that were required to be taken into account when rating an officer's productivity, but that were not mentioned in his evaluation." *Id.* at 11 (Am. Compl. ¶ 61).

At the end of their meeting, Sergeant London told plaintiff that he was placing him on a Performance Improvement Plan ("PIP"). Plaintiff asked for an opportunity to meet with Lieutenant Steve Boyda to discuss his annual review. A few days later, plaintiff met with Lieutenant Boyda and Sergeant Pat Tiede. Plaintiff told Lieutenant Boyda and Sergeant Tiede that he felt like the RCPD was retaliating against him for raising concerns about the mandatory quota system. In response, Lieutenant Boyda and Sergeant Tiede told plaintiff he should lower his threshold for probable cause which would permit him to stop more drivers and increase his probabilities for making DUI arrests. Plaintiff responded that he couldn't arrest a driver who

was not going to test for a DUI violation.  Also, plaintiff told Lieutenant Boyda and Sergeant Tiede that he was going to appeal his annual evaluation rating and PIP.

In June 2016, plaintiff learned that Sergeant London had denied his request to interview for an open detective position because plaintiff had received a "below expectations" evaluation and was on a PIP.  On June 30, 2016, plaintiff met with Captain Josh Kyle to discuss his annual evaluation, his PIP, and his concerns about the mandatory quota system.  During this meeting, plaintiff told Captain Kyle that he "felt he was being targeted for expressing these concerns" about the quota system.  *Id.* at 13 (Am. Compl. ¶ 83).  Plaintiff asked Captain Kyle to investigate his complaints and assign him to a different supervisor during the investigation to avoid retaliation.  Captain Kyle told plaintiff that he would consider investigating his complaints but refused to assign him to a different supervisor.

After meeting with Captain Kyle, plaintiff submitted an appeal of his annual evaluation and PIP.  On July 7, 2016, Captain Kyle referred plaintiff's appeal to Director Bradley Schoen. Captain Kyle included a memo with plaintiff's appeal.  The memo concluded that plaintiff's evaluation was proper and explained that plaintiff had been treated fairly.  The memo never mentioned plaintiff's complaints about the quota system or his request for an investigation.

On July 18, 2016, Sergeant London met with plaintiff to discuss his first monthly evaluation.  In this evaluation, Sergeant London rated plaintiff "below expectations" in Leadership.  He based his evaluation solely on plaintiff's arrest statistics.  Also, Sergeant London rated plaintiff "below expectations" in Use of Force based on a June 19, 2016, brawl.  Plaintiff and Sergeant Bortnick had responded to the call about the brawl.  And, plaintiff asserts, Sergeant Bortnick falsely accused plaintiff of backing away from the fight twice and failing to turn on his

body camera. Plaintiff later learned that he was the subject of an internal investigation for failing to take appropriate action during the June 19 brawl.

Plaintiff concluded that his supervisors' actions showed they were taking "the initial steps toward termination." *Id.* at 15 (Am. Compl. ¶ 93). Because plaintiff knew that termination could damage his reputation and law enforcement career, he decided to resign instead of facing termination. On July 28, 2016, plaintiff submitted a letter of resignation. It recited "his inability to comply with the quota system and subsequent treatment as a factor" in his resignation decision. *Id.* (Am. Compl. ¶ 94). The RCPD accepted plaintiff's resignation. But Lieutenant Boyda denied that any actions that the RCPD took against plaintiff were retaliation for plaintiff's complaints about the quota system.

## II.    Legal Standards

### A.   Motion to Dismiss for Lack of Personal Jurisdiction Under Rule 12(b)(2)

A plaintiff bears the burden to establish personal jurisdiction over each defendant named in the action. *Rockwood Select Asset Fund XI (6)-1, LLC v. Devine, Millimet & Branch*, 750 F.3d 1178, 1179–80 (10th Cir. 2014). But, in preliminary stages of litigation, a plaintiff's burden to prove personal jurisdiction is a light one. *AST Sports Sci., Inc. v. CLF Distrib. Ltd.*, 514 F.3d 1054, 1056 (10th Cir. 2008).

Where, as here, the court is asked to decide a pretrial motion to dismiss for lack of personal jurisdiction without conducting an evidentiary hearing, plaintiff only must make a prima facie showing of jurisdiction to defeat the motion. *Id.* at 1056–57. "The plaintiff may make this prima facie showing by demonstrating, via affidavit or other written materials, facts that if true would support jurisdiction over the defendant." *OMI Holdings, Inc. v. Royal Ins. Co. of Can.*, 149 F.3d 1086, 1091 (10th Cir. 1998).

To defeat a plaintiff's prima facie showing of personal jurisdiction, defendants "must present a compelling case demonstrating 'that the presence of some other considerations would render jurisdiction unreasonable.'" *Id.* (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985)). Where defendants fail to controvert a plaintiff's allegations with affidavits or other evidence, the court must accept the well-pleaded allegations in the complaint as true, and resolve any factual disputes in the plaintiff's favor. *Wenz v. Memery Crystal*, 55 F.3d 1503, 1505 (10th Cir. 1995).

### B. Motion to Dismiss Based on Insufficient Service of Process Under Rule 12(b)(5)

"A federal court lacks personal jurisdiction over a defendant if service of process is insufficient under Rule 4." *Hagan v. Credit Union of Am.*, No. 11-1131-JTM, 2011 WL 6739595, at *1 (D. Kan. Dec. 22, 2011) (citation omitted). "Motions to dismiss under Rule 12(b)(2) and 12(b)(5) thus go hand-in-hand." *Schwab v. Kansas*, No. 16-4033-DDC-KGS, 2016 WL 4039613, at *3 (D. Kan. July 28, 2016). A Rule 12(b)(5) motion to dismiss based on insufficient service of process "challenges the mode or lack of delivery of a summons and complaint." *Oltremari by McDaniel v. Kan. Soc. & Rehab. Serv.*, 871 F. Supp. 1331, 1349 (D. Kan. 1994) (citations and internal quotation marks omitted). When a defendant moves to dismiss based on insufficient service of process under Rule 12(b)(5), the burden shifts to the plaintiff to make a prima facie showing that he served process properly. *Fisher v. Lynch*, 531 F. Supp. 2d 1253, 1260 (D. Kan. 2008) (citation omitted). When considering whether service was sufficient, a court may consider any "affidavits and other documentary evidence" submitted by the parties and must resolve any "factual doubt" in the plaintiff's favor. *Id.* (citation omitted).

### C. Motion to Dismiss for Failure to State a Claim Under Rule 12(b)(6)

Fed. R. Civ. P. 8(a)(2) provides that a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Although this Rule "does not require 'detailed factual allegations,'" it demands more than "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action'" which, as the Supreme Court explained, "will not do." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

When considering a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the court must assume that the factual allegations in the complaint are true. *Id.* (citing *Twombly*, 550 U.S. at 555). But the court is "'not bound to accept as true a legal conclusion couched as a factual allegation.'" *Id.* (quoting *Twombly*, 550 U.S. at 555). "'Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice'" to state a claim for relief. *Bixler v. Foster*, 596 F.3d 751, 756 (10th Cir. 2010) (quoting *Iqbal*, 556 U.S. at 678). Also, the complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 (citations omitted).

For a complaint to survive a motion to dismiss under Rule 12(b)(6), the pleading "must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 679 (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556); *see also Christy Sports, LLC v. Deer Valley Resort Co.*, 555 F.3d 1188, 1192

(10th Cir. 2009) ("The question is whether, if the allegations are true, it is plausible and not merely possible that the plaintiff is entitled to relief under the relevant law." (citation omitted)).

### III.    Analysis

Defendants assert four arguments in their Motion to Dismiss:  (1) the BOCC is not a proper party in this lawsuit; (2) the RCPD is not an entity with the capacity to be sued; (3) plaintiff's Amended Complaint fails to state a plausible claim under § 1983; and (4) plaintiff's Amended Complaint fails to state a plausible claim for public policy retaliatory discharge under Kansas law.  The court addresses each argument, in turn, below.

### A.  The BOCC is not a proper party to this lawsuit.

Defendants ask the court to dismiss the BOCC because, they contend, the BOCC is not a proper party subject to suit.  Plaintiff does not oppose defendants' request.  Doc. 19 at 4. Instead, plaintiff agrees with this part of defendants' motion.  *Id.*  For this reason, the court dismisses the BOCC as a party to this lawsuit.

### B.  The RCPD is not an entity with the capacity to be sued.

Next, defendants argue that the RCPD is not an entity with the capacity to be sued. Defendants thus seek dismissal of the RCPD based on lack of personal jurisdiction under Rule 12(b)(2) and insufficient service of process under Rule 12(b)(5).  In response, plaintiff concedes that the RCPD is not an entity with the capacity to be sued.  Doc. 19 at 3, 4.  Plaintiff thus does not oppose dismissal of the RCPD.  *Id.* at 3.  The court thus grants defendants' Motion to Dismiss the RCPD as a party to the lawsuit.

### C.  Motion to Dismiss § 1983 claims

Plaintiff's Amended Complaint asserts two claims under § 1983:  (1) Count I alleges a First Amendment retaliation claim against all defendants under § 1983; and (2) Count III alleges

a § 1983 claim against defendants BOCC, RCPD, RCLB, and Director Schoen in his official capacity for maintaining a policy or practice that requires officers to arrest individuals without probable cause. Defendants assert that the Amended Complaint fails to allege facts capable of supporting a finding or inference that defendants violated § 1983 under either theory. The court addresses plaintiff's two § 1983 claims, separately, below.

### 1. First Amendment Retaliation (Count I)

Count I of the Complaint asserts that defendants violated plaintiff's First and Fourteenth Amendment rights to free speech by retaliating against him and constructively discharging him from his employment after he complained about the RCPD's mandatory quota system. Our Circuit recognizes that "[p]ublic employees do not surrender their First Amendment rights by virtue of their employment with the government." *Bailey v. Indep. Sch. Dist. No. 69*, 896 F.3d 1176, 1180 (10th Cir. 2018) (quoting *Martin v. City of Del City*, 179 F.3d 882, 886 (10th Cir. 1999)). "A 'government employer cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression.'" *Id.* (quoting *Burns v. Bd. of Cty. Comm'rs*, 330 F.3d 1275, 1285 (10th Cir. 2003)). But, as our Circuit recognizes, "'the government has important interests in maintaining an efficient workplace and promoting the services that it renders,'" and so, "'the government has an increased degree of discretion in regulating a public employee's speech.'" *Id.* at 1180–81 (quoting *Martin*, 179 F.3d at 886).

The Tenth Circuit thus has directed district courts to balance "the interests of public employees in commenting on matters of public concern and the interests of government employers in performing services efficiently" using "the five-part *Garcetti/Pickering* test." *Id.* at 1181; *see also Dixon v. Kirkpatrick*, 553 F.3d 1294, 1301–02 (10th Cir. 2009) (first citing *Garcetti v. Ceballos*, 547 U.S. 410 (2006); then citing *Pickering v. Bd. of Educ.*, 391 U.S. 563

(1968)).  The *Garcetti/Pickering* test has five elements:  "(1) whether the speech was made pursuant to an employee's official duties; (2) whether the speech was on a matter of public concern; (3) whether the government's interests, as employer, in promoting the efficiency of the public service are sufficient to outweigh the plaintiff's free speech interests; (4) whether the protected speech was a motivating factor in the adverse employment action; and (5) whether the defendant would have reached the same employment decision in the absence of the protected conduct."  *Dixon*, 553 F.3d at 1302.  The Tenth Circuit has instructed that the first three elements present "issues of law to be decided by the court."  *Id.*  "The last two are factual issues to be decided by the factfinder."  *Id.*

Here, defendants argue that plaintiff's First Amendment retaliation claim fails to state a claim under the *Garcetti/Pickering* analysis for two independent reasons:  (1) plaintiff's speech was made as part of his official duties, and thus is not entitled to First Amendment protection under the first element of the *Garcetti/Pickering* test; and (2) plaintiff's speech did not involve a matter of public concern as required by the *Garcetti/Pickering* test's second element.  The court agrees with defendants on both points.

The Amended Complaint, viewed in plaintiff's favor, fails to allege facts capable of supporting a finding or inference that plaintiff engaged in First Amendment protected speech under either of these two elements of the *Garcetti/Pickering* analysis.  The Amended Complaint thus fails to state a plausible First Amendment retaliation claim under § 1983 for two independent reasons.[1]  The court explains these conclusions, in the next two subsections.

---

[1]     Defendants assert several other arguments supporting dismissal of plaintiff's First Amendment retaliation claim, including:  (1) the Amended Complaint fails to allege any acts specifically committed by defendants RCLB or Director Schoen that violate § 1983; (2) the Amended Complaint fails to allege facts capable of supporting a finding or inference that defendants constructively discharged plaintiff from his employment with the RCPD; and (3) plaintiff's claims against the individual defendants—defendants London, Boyda, Kyle, and Schoen (in his individual capacity)—are barred by qualified immunity.

### a. Plaintiff's speech was made as part of his official duties.

The first inquiry under the *Garcetti/Pickering* analysis "is whether the employee spoke 'pursuant to [his] official duties.'" *Hesse v. Town of Jackson*, 541 F.3d 1240, 1249 (10th Cir. 2008) (quoting *Garcetti*, 547 U.S. at 421) (other citation omitted). "While 'employees retain the prospect of constitutional protection for their contributions to the civic discourse,' they do not have First Amendment protection for statements made 'pursuant to employment responsibilities.'" *Id.* (first quoting *Garcetti*, 547 U.S. at 422; then quoting *id.* at 423–24). "If the employee speaks pursuant to his official duties, then there is no constitutional protection because the restriction on speech 'simply reflects the exercise of employer control over what the employer itself has commissioned or created.'" *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 492 F.3d 1192, 1202 (10th Cir. 2007) (quoting *Garcetti*, 547 U.S. at 422). "Thus, 'speech relating to tasks within an employee's uncontested employment responsibilities is not protected from regulation.'" *Hesse*, 541 F.3d at 1249 (quoting *Brammer-Hoelter*, 492 F.3d at 1203). "The determination of whether a public employee speaks pursuant to official duties is a matter of law." *Id.* (citing *Brammer-Hoelter*, 492 F.3d at 1203).

The Tenth Circuit takes a "broad" view of the definition of speech that is made "pursuant to" an employee's "official duties." *Thomas v. City of Blanchard*, 548 F.3d 1317, 1324 (10th Cir. 2008). "[S]peech may be made pursuant to an employee's official duties even if it deals with activities that the employee is not expressly required to perform." *Brammer-Hoelter*, 492 F.3d at 1203 (holding that speech could be considered within the scope of an employee's official duty even if "the speech concerns an unusual aspect of an employee's job that is not part of his everyday functions."). So long as the employee's speech "reasonably contributes to or facilitates

---

Because the court determines that plaintiff's Amended Complaint fails to allege a constitutional violation based on First Amendment retaliation, the court need not reach defendants' other dismissal arguments.

the employee's performance of the official duty, the speech is made pursuant to the employee's official duties." *Id.*

"The ultimate question is whether the employee speaks as a citizen or instead as a government employee—an individual acting 'in his or her professional capacity.'" *Id.* (quoting *Garcetti*, 547 U.S at 422). To decide this question, the Tenth Circuit "take[s] a practical view of all the facts and circumstances surrounding the speech and the employment relationship." *Id.* at 1204 (quoting *Garcetti*, 547 U.S at 422 ("'The proper inquiry is a practical one.'")). The Tenth Circuit uses "a case-by-case approach, looking both to the content of the speech, as well as the employee's chosen audience, to determine whether the speech is made pursuant to an employee's official duties." *Rohrbough v. Univ. of Colo. Hosp. Auth.*, 596 F.3d 741, 746 (10th Cir. 2010).

Here, the Amended Complaint alleges that plaintiff raised his concerns about the RCPD's quota system to his supervisors and in response to their criticisms about his job performance. *See, e.g.*, Doc. 5-1 at 6–15 (¶¶ 35, 37, 43–45, 55, 57, 62–63, 65, 68, 70, 71, 72, 83–84, 86, 89, 90, 94). As our Circuit has explained, "speech directed at an individual or entity within an employee's chain of command is often found to be pursuant to that employee's official duties under *Garcetti/Pickering*." *Rohrbough*, 596 F.3d at 747 (citations omitted). "But an employee's decision to go outside of [his] ordinary chain of command does not necessarily insulate [his] speech." *Id.* Instead, "the proper focus is ultimately still whether the speech 'stemmed from and [was of] the type . . . that [the employee] was paid to do,' regardless of the exact role of the individual or entity to which the employee has chosen to speak." *Id.* (quoting *Green v. Bd. of Cty. Comm'rs*, 472 F.3d 794, 798 (10th Cir. 2007)).

Even construing the Amended Complaint in plaintiff's favor, one cannot infer plausibly that plaintiff asserted his concerns about the quota system as a private citizen. Instead, the

Amended Complaint alleges that plaintiff directed his speech to his immediate supervisors and others in his chain of command—but no one outside that chain of command. And the Amended Complaint alleges that plaintiff complained about his employer's use of arrest statistics to evaluate his performance—describing this practice as a mandatory quota system that required officers to make unjustified stops and false arrests. Our Circuit has found similar kinds of complaints—directed to supervisors—is speech made pursuant to an employee's official duties, and thus not entitled to First Amendment protection. *See Rohrbough*, 596 F.3d at 750–51 (holding that plaintiff's communications with other hospital employees about an alleged staffing crisis, alleged incidents of sub-standard care, and a heart misallocation "were all within the scope of [plaintiff's] official duties under the first prong of the *Garcetti/Pickering* analysis"); *see also Ellison v. Roosevelt Cty. Bd. of Cty. Comm'rs*, 700 F. App'x 823, 829–30 (10th Cir. 2017) (affirming a district court's Rule 12(b)(6) dismissal of a deputy sheriff's First Amendment retaliation claim because the deputy sheriff's alleged speech—which included his disagreement with a lieutenant about the legality of a traffic stop and his reports about another officer's misconduct—were within the scope of his official duties).

Plaintiff responds that, as a street officer, "he had no authority to set arrest practices and policies." Doc. 19 at 7. Thus, plaintiff argues, his complaints about those policies fell outside his official duties. *Id.* The court disagrees. Although plaintiff may have lacked the authority to set or implement the RCPD's policies, he alleges that his supervisors required him to follow those policies—specifically the quota policy—during his work as a police officer. And plaintiff alleges that his supervisors criticized his job performance for failing to meet the goals of the quota system. Plaintiff's complaints about a mandatory quota policy that his employer applied to his work as a police officer—and that he made to his direct supervisors and others in his chain of

command—thus fall squarely within the scope of his official duties. And because plaintiff's speech was made as part of his official duties, it deserves no First Amendment protection under the first prong of the *Garcetti*/*Pickering* test.

Also, plaintiff argues, the Supreme Court's decision in *Lane v. Franks*, 573 U.S. 228 (2014), and the Tenth Circuit's decision in *Seifert v. Unified Government of Wyandotte County*, 779 F.3d 1141 (10th Cir. 2015), show that plaintiff's speech was not speech made pursuant to his official duties. In *Lane*, an employee alleged that his employer had retaliated against him for testifying against a former co-worker pursuant to a subpoena. *Lane*, 573 U.S. at 238. The Supreme Court held that "testimony under oath by a public employee outside the scope of his ordinary job duties is speech as a citizen [and not as an employee] for First Amendment purposes." *Id.* Similarly, in *Seifert*, the plaintiff "testified for a private party, not his public employer; in a civil lawsuit, not a criminal prosecution; against law-enforcement entities, not for them; and in compliance with a subpoena, not an employer mandate." *Seifert*, 779 F.3d at 1152. The Tenth Circuit held that plaintiff's "testimony was not among 'the type of activities that [he] was paid to do,'" and thus fell outside the scope of his official duties. *Id.* (quoting *Green*, 472 F.3d at 801).

In contrast, here, plaintiff's complaints about the mandatory quota system were not public testimony like the speech at issue in *Lane* and *Seifert*. Instead, plaintiff's speech involved matters about his official job duties, unlike the speech at issue in *Lane* and *Seifert*. The court thus concludes that plaintiff's speech—even when viewed in the light most favorable to him— fails to satisfy the first element of the *Garcetti*/*Pickering* test. Consequently, plaintiff fails to state a plausible claim for First Amendment retaliation.

**b. Plaintiff's speech is not a matter of public concern.**

Even if plaintiff's Amended Complaint plausibly alleges that his speech falls outside his official duties, his First Amendment retaliation claim still fails as a matter of law for a second and independent reason. The speech described in the Amended Complaint does not satisfy the second element of the *Garcetti/Pickering* test—*i.e.*, his speech is not a matter of public concern. Speech is a matter of public concern "'when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public.'" *Lane v. Franks*, 573 U.S. 228, 241 (2014) (quoting *Snyder v. Phelps*, 562 U.S. 443, 453 (2011)) (other internal quotations omitted). "The inquiry turns on the 'content, form, and context' of the speech." *Id.* (quoting *Connick v. Myers*, 461 U.S. 138, 147–48 (1983)).

To satisfy this requirement, plaintiff must allege facts capable of supporting a finding or inference that his speech "involve[d] a matter of public concern and not merely a personal issue internal to the workplace." *Moore v. City of Wynnewood*, 57 F.3d 924, 931 (10th Cir. 1995) (citing *Connick*, 461 U.S. at 146–47); *see also Morris v. City of Colo. Springs*, 666 F.3d 654, 661 (10th Cir. 2012) ("[S]peech relating to internal personnel disputes and working conditions ordinarily will not be viewed as addressing matters of public concern." (citation and internal quotation marks omitted)). When deciding this issue, the court may consider "'the motive of the speaker and whether the speech is calculated to disclose misconduct or merely deals with personal disputes and grievances unrelated to the public's interest.'" *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 492 F.3d 1192, 1205 (10th Cir. 2007) (quoting *Lighton v. Univ. of Utah*, 209 F.3d 1213, 1224 (10th Cir. 2000)). "Statements revealing official impropriety usually involve matters of public concern." *Id.* (citing *Lighton*, 209 F.3d at 1224). "Conversely, speech

that simply airs 'grievances of a purely personal nature' typically does not involve matters of public concern." *Id.* (quoting *Lighton*, 209 F.3d at 1225). In short, a public employee's First Amendment right to free speech "'is not a right to transform everyday employment disputes into matters for constitutional litigation.'" *Morris*, 666 F.3d at 663 (quoting *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 399 (2011)).

Defendants assert that plaintiff's speech involved no matter of public concern because it was internal to the RCPD and personal in nature—*i.e.*, plaintiff made his complaints in response to his supervisor's criticisms and evaluations about his performance, not on a matter of public concern. Plaintiff responds to this argument with just one sentence: "When a police officer alleges that he spoke about police misconduct such speech is considered a matter of public concern." Doc. 19 at 7 (citing *Teague v. City of Flower Mound*, 179 F.3d 377 (5th Cir. 1999)). As defendants correctly explain, *Teague* does not save plaintiff's First Amendment retaliation claim from dismissal for several reasons.

First, the Fifth Circuit held that the alleged speech at issue in *Teague* was *not* a matter of public concern. The Fifth Circuit recognized, generally, that "speech regarding police misconduct constitutes a matter of public concern." 179 F.3d at 381. And, it held, although plaintiffs' speech "concerning police misconduct [was] public in content," the *context* of plaintiffs' speech was "more appropriately characterized as private" because "[i]t was made in the setting of a private employee-employer dispute." *Id.* at 383. The Fifth Circuit thus held that plaintiffs' speech was "not entitled to First Amendment protection." *Id.* And so, it affirmed summary judgment against plaintiffs' First Amendment retaliation claim. *Id.* at 384. Likewise here, plaintiff made his complaints about a mandatory quota system in the private setting of an employee-employer dispute after his supervisors had criticized his performance based on his

failure to meet arrest quotas. Thus, like *Teague*, plaintiff's speech is "more appropriately characterized as private" and thus receives no First Amendment protection. *Id.* at 383.

Second, *Teague* is an opinion from the Fifth Circuit. It serves only as persuasive authority in our Circuit. And, in any event, the Fifth Circuit decided *Teague* in 1999—seven years before the Supreme Court decided *Garcetti* in 2006. The Supreme Court's holding in *Garcetti* makes clear that a plaintiff's speech is entitled to First Amendment protection only when "the employee spoke *as a citizen* on a matter of public concern." *Garcetti*, 547 U.S. at 418. Here, the Amended Complaint never alleges facts from which a reasonable factfinder could find or infer that plaintiff spoke as a citizen when he complained about the quota system. Instead, the facts viewed in plaintiff's favor allege only that plaintiff complained about the quota system in his position as a police officer and in response to his supervisor's complaints about this performance.

Finally—and perhaps most importantly—the Amended Complaint, construed in plaintiff's favor, never alleges that plaintiff complained about any *actual* police misconduct. Plaintiff never alleges that his supervisors instructed or required him to arrest individuals without probable cause. Also, the Amended Complaint never alleges that any RCPD officer actually made an arrest without probable cause. Instead, plaintiff just alleges that he *believed* the quota policy "*would likely* force officers to make unsupported stops resulting in departmental violations and Fourth Amendment issues." Doc. 5-1 at 6 (Am. Comp. ¶ 35) (emphasis added).

After the parties submitted their briefing on defendants' Motion to Dismiss, plaintiff submitted a Notice of Supplemental Authority under D. Kan. Rule 7.1(f). Doc. 21. His notice cites a Tenth Circuit opinion published after the parties had filed their briefs. *Id.* at 1 (citing *Bailey v. Indep. Sch. Dist. No. 69*, 896 F.3d 1176, 1180 (10th Cir. 2018)). Plaintiff asserts that

*Bailey* supports his argument that his speech was a matter of public concern because it "concerned a matter of criminal justice in the community." *Id.* at 2. The court disagrees.

*Bailey* involved a plaintiff who asserted a First Amendment retaliation claim against a school district. The plaintiff alleged that the district had terminated his employment as retaliation for writing a letter to a sentencing judge on his nephew's behalf. *Bailey*, 896 F.3d at 1179. Plaintiff's nephew had pleaded guilty to various state charges including a count of manufacturing child pornography, and he was awaiting sentencing. *Id.* The Tenth Circuit recognized that the plaintiff "certainly had a personal interest in the outcome of his nephew's sentencing proceeding," but that did not "preclude [the speech's] treatment as a public matter." *Id.* at 1182. Instead, the Tenth Circuit found, "sentencing proceedings . . . are . . . quintessentially matters of public concern." *Id.* Also, the content of plaintiff's letter provided "information key to" the factors that a sentencing judge considers when making sentencing decisions. *Id.* The Tenth Circuit concluded, "[t]he public is necessarily intimately concerned with sentencing decisions." *Id.* And thus, it ruled, plaintiff's speech was protected by the First Amendment. *Id.*

Plaintiff's allegations here are markedly different. Plaintiff never alleges that he spoke outside the RCPD in a forum or proceeding involving a matter of public concern. Instead, the Amended Complaint only alleges that plaintiff raised his concerns internally and within his chain of command at the RCPD. Thus, the context and form of plaintiff's speech is unlike the protected speech at issue in *Bailey*.

For all these reasons, the Amended Complaint, even when viewed in plaintiff's favor, fails to allege facts capable of supporting a finding or inference that plaintiff spoke on a matter of

public concern.  Plaintiff thus fails to state a plausible claim for First Amendment retaliation under the second element of the *Garcetti/Pickering* test.

### 2.  Municipal Liability (Count III)

Plaintiff's Amended Complaint also asserts a municipal liability claim under § 1983 against the RCLB and its Director, Bradley D. Schoen, in his official capacity.  Doc. 5-1 at 18 (Count III).  Count III alleges that these defendants have maintained an unconstitutional policy or practice that requires officers to arrest individuals without probable cause.  Defendants argue that plaintiff's Count III fails as a matter of law for two reasons.

*First*, defendants contend, plaintiff alleges no underlying constitutional violation, something that is necessary to support a municipal liability claim under § 1983.  To assert a § 1983 claim against a municipality based on acts by one or more of its employees, a plaintiff must allege facts capable of supporting an inference that the municipality has a policy or custom that directly caused the deprivation of a constitutional right.  *City of Canton v. Harris*, 489 U.S. 378, 385 (1989); *Patel v. Hall*, 849 F.3d 970, 978 (10th Cir. 2017).  Here, plaintiff alleges that defendants violated his First Amendment rights by retaliating against him for complaining about the mandatory quota policy.  Plaintiff asserts that he has stated a municipal liability claim because the mandatory quota policy was the subject of his allegedly protected speech.  Doc. 19 at 10.  But, as discussed above, plaintiff has failed to allege facts supporting a plausible First Amendment retaliation claim.  *See supra* Part III.C.1.  Plaintiff thus fails to allege an underlying constitutional violation capable of causing a deprivation of his First Amendment rights.  As a consequence, his municipal liability claim fails as a matter of law.

*Second*, defendants contend, plaintiff has identified no custom or policy that caused defendants to violate *plaintiff's* constitutional rights.  Count III alleges that "[t]he Fourth and

Fourteenth Amendments require the presence of probable cause to support an arrest or seizure of an individual" but defendants "maintained a policy or practice . . . requiring officers to make arrests of individuals without the presence of probable cause." Doc. 5-1 at 18 (Am. Compl. ¶¶ 118–19). But the Amended Complaint never alleges facts capable of supporting a finding or inference that defendants violated *plaintiff's* Fourth Amendment rights by arresting him without probable cause. Indeed, the Amended Complaint never alleges any facts showing that the mandatory quota policy caused any RCPD officer to arrest anyone without probable cause. Plaintiff thus fails to state a plausible municipal liability claim under § 1983.

### 3. The Court Dismisses Plaintiff's § 1983 Claims.

Because the Amended Complaint fails to allege facts capable of supporting a finding or inference that plaintiff engaged in speech constitutionally protected by the First Amendment, plaintiff's § 1983 claim based on First Amendment retaliation (Count I) fails as a matter of law. Also, because the Amended Complaint fails to allege facts capable of supporting a finding or inference necessary to support an underlying constitutional violation, plaintiff's municipal liability claim under § 1983 (Count III) likewise fails as a matter of law under Rule 12(b)(6).

Plaintiff's Opposition to defendants' Motion to Dismiss asks "if the Court finds that he has inadequately pleaded any or all of the claims in the Amended Complaint that he be permitted to file a Second Amended Complaint to cure those deficiencies." Doc. 19 at 13. The court declines to grant plaintiff leave to amend based on his cursory request. Plaintiff provides no explanation how he intends to amend his Complaint. *See* D. Kan. Rule 15.1(a)(2) (requiring a party seeking leave to file an amended pleading to attach the proposed pleading or other document). Thus, the court cannot discern whether plaintiff's proposed amendments might cure the deficiencies of plaintiff's § 1983 claims as he has pleaded them in his Amended Complaint.

Also, to cure the deficiencies the court has identified, plaintiff must plead significantly new facts about his speech, including ones about the form and context of the speech alleged that would bring it within the scope of First Amendment protected speech. If plaintiff possessed such facts, the court questions why plaintiff failed to include them in his original and Amended Complaint in the first place—or why plaintiff didn't seek leave to amend to include those facts in response to defendants' dismissal arguments. Under these circumstances, the court finds no reason to grant plaintiff leave to amend his § 1983 claims.

### D. Motion to Dismiss Kansas Retaliatory Discharge Claim

Last, defendants move to dismiss plaintiff's retaliatory discharge claim asserted under Kansas law (Count II). But, because the court has concluded that plaintiff has failed to state a claim for relief under federal law, the court may decline to exercise supplemental jurisdiction over his remaining state law claim. 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction [when] the district court has dismissed all claims over which it has original jurisdiction.").

The decision whether to exercise supplemental jurisdiction in this circumstance is committed to the district court's sound discretion. *Exum v. U.S. Olympic Comm.*, 389 F.3d 1130, 1138–39 (10th Cir. 2004). Indeed, the Tenth Circuit has expressed the preference that a district court decline jurisdiction over state law claims if it dismisses all federal claims. *See Smith v. City of Enid ex rel. Enid City Comm'n*, 149 F.3d 1151, 1156 (10th Cir. 1998) ("When all federal claims have been dismissed, the court may, *and usually should*, decline to exercise jurisdiction over any remaining state claims." (emphasis added)). The Supreme Court has directed district courts, when deciding whether to maintain supplemental jurisdiction over state law claims, to consider "the values of judicial economy, convenience, fairness, and comity . . . ." *Carnegie-*

*Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988); *see also Wittner v. Banner Health*, 720 F.3d 770, 781 (10th Cir. 2013) ("[W]e have said the court should consider retaining state claims when, given the nature and extent of pretrial proceedings, judicial economy, convenience, and fairness would be served by retaining jurisdiction." (citation and internal quotation marks omitted)).

Exercising its discretion, the court declines to assert supplemental jurisdiction over plaintiff's remaining state law claim. The governing factors favor this outcome. Dismissing plaintiff's state law claim without prejudice will not waste judicial resources because no pretrial proceedings or discovery have taken place yet. Also, this result does not treat plaintiff unfairly. Title 28 U.S.C. § 1367 tolls the statute of limitations for state law claims while they are pending in federal court and for 30 days after they are dismissed "unless State law provides for a longer tolling period." 28 U.S.C. § 1367(d); *see also Brooks v. Gaenzle*, 614 F.3d 1213, 1230 (10th Cir. 2010). Kansas's "saving statute" affords plaintiffs six months to commence a new action if an earlier, timely filed action has failed "otherwise than upon the merits." Kan. Stat. Ann. § 60-518. A dismissal "otherwise than upon the merits" includes a dismissal without prejudice. *Rogers v. Williams, Larson, Voss, Strobel & Estes*, 777 P.2d 836, 839 (Kan. 1989). In sum, nothing will prevent plaintiff from refiling his state law claim in Kansas court, so long as he timely files it.

The Kansas state courts also provide the same level of convenience and fairness as federal courts. And, importantly, comity strongly favors remand. Kansas state courts have a strong interest in deciding matters involving purely state law claims—as does plaintiff's retaliatory discharge claim here. *Brooks*, 614 F.3d at 1230 ("'[N]otions of comity and federalism demand that a state court try its own lawsuits, absent compelling reasons to the contrary.'") (quoting *Ball v. Renner*, 54 F.3d 664, 669 (10th Cir. 1995)).

Because all factors favor dismissal without prejudice and the court finds no compelling reason to the contrary, the court declines to exercise its supplemental jurisdiction over plaintiff's remaining state law claim.  The court thus dismisses plaintiff's Count II claim without prejudice

## IV.     Conclusion

For reasons explained, the court grants defendants' Motion to Dismiss plaintiff's claims against the BOCC and the RCPD.  Also, the court dismisses plaintiff's § 1983 claims under Fed. R. Civ. P. 12(b)(6) because they fail to state a plausible claim for relief.  And the court declines to exercise supplemental jurisdiction over plaintiff's remaining Kansas state law claim.  The court thus dismisses, without prejudice, plaintiff's Kansas retaliatory discharge claim asserted in Count II.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendants' Motion to Dismiss (Doc. 16) is granted in part and denied in part.  The court dismisses plaintiff's federal § 1983 claims under Fed. R. Civ. P. 12(b)(6) because they fail to state a plausible claim for relief. The court declines to exercise supplemental jurisdiction over plaintiff's state law claim and thus dismisses the state law claim without prejudice.  The Clerk shall enter a judgment consistent with this ruling.

**IT IS SO ORDERED.**

**Dated this 9th day of January, 2019, at Kansas City, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**